**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |  |
|---|---|---|---|
| _____ | : |  |  |
|  | : | Civil Action Nos. | 3:14-CV-3799 |
| *In re* OCEAN POWER TECHNOLOGIES, | : |  | 3:14-CV-3815 |
| INC., SECURITIES LITIGATION, | : |  | 3:14-CV-4015 |
|  | : |  | 3:14-CV-4592 |
|  | : |  |  |
| THIS DOCUMENT APPLIES TO | : | **OPINION** |  |
| ALL ACTIONS | : |  |  |
|  | : |  |  |
| _____ | : |  |  |

**<u>WOLFSON, United States District Judge:</u>**

Before the Court are the motions for final approval of a proposed settlement and an award of attorneys' fees and reimbursement of expenses filed by Lead Plaintiff FiveMore Special Situations Fund, Ltd., through counsel Levi & Korsinsky LLP. This settlement will resolve all claims asserted against Defendants Ocean Power Technologies, Inc. ("OPT"), Charles Dunleavy, Roth Capital Partners LLC, and Mark A. Featherstone. Defendants, through counsel, consent to the motions for final approval of settlement and take no position on the motion for an award of attorneys' fees and reimbursement of expenses. One putative class member, Anand L. Daniell, objects to the settlement and plan of allocation.

For the reasons set forth below, Lead Plaintiff's motion for final approval of the parties' settlement of $3 million in cash and 380,000 shares of OPT common stock is granted. Lead Counsel is awarded $900,000 and 114,000 shares of OPT common stock (30% of the fund), plus $207.55 (30% of the interest accrued on the fund between its deposit in escrow and this Court's Order), and $22,793.51 in costs. <u>See, e.g., In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d 516,

526 n.9 (3d Cir. 2004) (The NSF [net settlement fund] is to be calculated as follows: [principal] plus accrued interest, less court-awarded attorneys' fees, costs and expenses, less costs of notice to class members, less costs of administering the fund, and less taxes.)]. All attorney's fees and costs are payable from the settlement fund.

## I. FACTUAL BACKGROUND

This case is a securities class action brought on behalf of investors who purchased or otherwise acquired (i) OPT securities between January 14, 2014 and July 29, 2014; and/or (ii) purchased or otherwise acquired OPT securities pursuant to and/or traceable to OPT's April 4, 2014 follow-on stock offering. Plaintiffs allege that Defendants disseminated false and misleading statements about OPT's products. Specifically, Plaintiffs claimed that OPT's utilityscale "Power Buoy" was technologically deficient and incapable of performing in the manner represented by Defendants during the class period. Plaintiffs and other members of the Settlement Class purchased OPT common stock based upon these alleged misrepresentations and/or omissions.

The lawsuit seeks money damages against Defendants for alleged violations of the federal securities laws. Defendants have denied and continue to deny each and all of the claims and contentions alleged by the Plaintiff in the Litigation. Defendants continue to assert that they did not violate the Securities Act or the Exchange Act, that they did not engage in any conduct that could give rise to any liability to Plaintiffs or the Settlement Class, that none of the claimed statements of omissions caused damages to Plaintiffs or the Settlement Class, and that none of the claimed misstatements or omissions were material.

## II. PROCEDURAL HISTORY

This case began with the filing of four separate securities class action lawsuits pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act")—Roby v. Ocean Power, Civ. No. 14-3799, Chew v. Ocean Power, Civ. No. 14-3815, Konstantinidis v. Ocean Power, Civ. No. 14-4015, and Turner v. Ocean Power, Civ. No. 14-4592—each asserting substantively similar allegations. On March 17, 2015, this Court consolidated the actions and appointed Lead Plaintiff pursuant to the Private Securities Litigation Reform Act of 1995 ( "PSLRA").

Lead Plaintiff filed an amended complaint on May 18, 2015. Defendant OPT moved to dismiss the amended complaint on July 17, 2015. Before the parties fully briefed the motion to dismiss, they attempted to resolve the case through mediation before Mr. Bruce Friedman, Esq., on August 28, 2015. The mediation was unsuccessful.

 On September 3, 2015, Lead Plaintiff filed its Second Amended Class Action Complaint. Shortly thereafter, on October 3, 2015, Lead Plaintiff filed the Third Amended Class Action Complaint. Defendants OPT, Dunleavy, and Roth Capital moved to dismiss the Third Amended Class Action Complaint on November 5 and 6, 2015.

On November 19, 2015, while in the midst of briefing Defendants' motions to dismiss, the parties attempted once again to resolve this action through several telephonic negotiation sessions before Mr. Bruce Friedman, Esq. The parties' attempts were once again unsuccessful.

Once briefing was completed on Defendants' motions to dismiss, the parties approached one another in another attempt to resolve the action. After several arm's length conversations, the parties were finally able to agree on a settlement in principle on April 5, 2016. The parties filed a stipulation of settlement, setting forth the terms of their proposed agreement on May 5, 2016, and

moved for preliminary approval by the Court. On June 7, 2016, the Court granted preliminary approval of the settlement, conditionally certified the proposed class, approved the form and content of the proposed class notice, and set a settlement hearing for November 14, 2016.

On October 31, 2016, putative class member Anand L. Daniell filed a notice of intent to appear and objections to the proposed settlement and plan of allocation. Lead Plaintiff responded to Objector Daniell's notice on November 7, 2016. In its response, Lead Plaintiff stated that it had not received documentation establishing Objector Daniell's purchase of Ocean Power securities during the class period, and thus questioned Objector Daniell's standing to object to the settlement. On November 10, 2016 the Court ordered Objector Daniell to provide proof of ownership of securities purchased during the class period by the end of the day. In compliance with the order, Objector Daniell submitted a statement with attached trade notifications indicating purchases of Ocean Power securities during the class period on November 10, 2016.

The matter came before the Court for a hearing on November 14, 2016, at which Lead Counsel, Counsel for Defendants Ocean Power Technologies, Charles Dunleavy, and Roth Capital Partners, and Objector Daniell, *pro se*, appeared. The Court heard extensive argument from Objector Daniell and took sworn testimony from Objector Daniell concerning his objections and his provision of proof of claim. After consideration of Objector Daniell's arguments and hearing from Lead Counsel, the Court rejected the objections and clarified on the record that the October 2015 stock split does not affect the plan of allocation or the number of shares to be awarded as part of the settlement fund in this case. After the Court's ruling Mr. Daniell stated on the record that the Court's clarification allayed many of his concerns and withdrew his substantive objections. The Court then summarized its findings approving the settlement and awarding attorney's fees as set forth in the opinion to follow.

## III. TERMS OF SETTLEMENT

The settlement agreement provides for the payment by Defendants of $3 million in cash and 380,000 shares of Ocean Power Technologies common stock to establish a settlement fund. At the November 14, 2016 hearing Lead Counsel represented that, in accordance with the stipulation executed by the parties, Defendant Ocean Power Technologies insurer paid $2.5 million into the fund and Ocean Power Technologies itself paid $500,000 into the fund after the Court preliminarily approved the settlement.[1] The stipulation provides that Ocean Power Technologies will issue and distribute the 380,000 shares of settlement stock to Lead Counsel, or at Lead Counsel's instruction, to the Claims Administrator, as fiduciary for and for the benefit of the class, within ten business days after the Court enters final judgment.

The Settlement Fund is to be distributed on a *pro rata* basis pursuant to the Plan of Allocation to those Settlement Class Members submitting valid claims. As set forth in the Class Notice, the Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Settlement Fund (approved costs, fees and expenses) based upon each Authorized Claimant's Recognized Claim. The proposed Plan of Allocation compensates class members for the decrease in the price of OPT's securities occurring upon the revelation of the truth about Defendants' alleged misrepresentations to the investing public may, on the theory that such decrease may be used to measure the alleged artificial inflation in the price of OPT's securities prior to such revelations.

---

[1] The Stipulation, Dkt. No. 81 at ¶¶ 2.0-2.1, called for the wire transfer of the cash portion of the settlement to be made within 20 business days of the preliminary approval order, which was July 6, 2016.

## IV. JURISDICTION

This Court has subject-matter jurisdiction over Plaintiffs' claims under § 22 of the

Securities Act, 15 U.S.C. § 77v, as well as under the general federal-question statute, 28 U.S.C. §

1331. The Court has personal jurisdiction over defendants, plaintiffs, and all other Class

Members. "In the class action context, the district court obtains personal jurisdiction over the

absentee class members by providing proper notice of the impending class action and providing

the absentees with the opportunity to be heard or the opportunity to exclude themselves from the

class." In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 306 (3d Cir. 1998).

## V. CLASS CERTIFICATION

The Third Circuit has consistently observed that "Rule 23 is designed to assure that courts

will identify the common interests of class members and evaluate the named plaintiffs' and

counsel's ability to fairly and adequately protect class interests." In re Comm. Bank of N. Va.,

622 F.3d 275, 291 (3d Cir. 2010) (quoting In re General Motors Corp. Pick-Up Truck Fuel Tank

Products Liability Litigation, 55 F.3d 768, 799 (3d Cir. 1995) (alterations omitted). In order to

approve a class settlement agreement, "a district court must determine that the requirements for

class certification under Federal Rule of Civil Procedure 23(a) and (b) are met and must

determine that the settlement is fair to the class under Federal Rule of Civil Procedure 23(e)." In

re Insurance Brokerage Antitrust Litigation, 579 F.3d 241, 257-58 (3d Cir. 2009); In re Pet Food

Prods. Liab. Litig., 629 F.3d 333, 341 (3d Cir. 2010). ("a district court first must determine that

the requirements for class certification under Rule 23(a) and (b) are met.")

"The requirements of [Rule 23] (a) and (b) are designed to insure that a proposed class

has 'sufficient unity so that absent class members can fairly be bound by decisions of class

representatives.'" In re Prudential Ins. Co., 148 F.3d at 309 (quoting Amchem, 521 U.S. at 621).

Under Rule 23(a), the prerequisites to class certification are:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class
>
> Fed. R. Civ. P. 23(a); see also Amchem Products, Inc. v. Windsor, 521 U.S. 591, 613 (1997). "Upon finding each of these prerequisites satisfied, a district court must then determine that the proposed class fits within one of the categories of class actions enumerated in Rule 23(b)." Sullivan v. DB Investments, Inc., 667 F.3d 273, 296 (3d Cir. 2011).

Certification pursuant to Rule 23(b)(3), applicable in cases like the one presently before the Court in which Plaintiffs seek monetary compensation, is permitted where (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); see Collins v. E.I. DuPont de Nemours & Co., 34 F.3d 172, 180 (3d Cir. 1994); Amchem, 521 U.S. at 618 ("Among current applications of Rule 23(b)(3), the 'settlement only' class has become a stock device"). The "factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence. In other words, to certify a class the district court must find that the evidence more likely than not establishes each fact necessary to meet the requirements of Rule 23." In re Insurance Brokerage, 552 F.3d at 258 (citations and internal quotations omitted). Accordingly,

"[c]lass certification is proper only if the [] court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." Id. (internal quotation marks omitted).

"Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate." In re Prudential Ins. Co., 148 F.3d at 316 (internal quotation marks omitted); see Fed. R. Civ. P. 23(e)(2) (stating that a district court may approve a proposed settlement "only after a hearing and on finding that it is fair, reasonable, and adequate"). In In re Insurance Brokerage the Third Circuit affirmed the applicability of nine factors, established in Girsh v. Jepson 521 F.2d 153, 157 (3d Cir. 1975), which are to be considered when determining the fairness of a proposed settlement. "In cases of settlement classes, where district courts are certifying a class and approving a settlement in tandem, they should be 'even more scrupulous than usual when examining the fairness of the proposed settlement.'" In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 436 (3d Cir. 2016), as amended (May 2, 2016) (quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004)).

Finally, as the Supreme Court has observed, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial. But other specifications of [Rule 23] -- those designed to protect absentees by blocking unwarranted or overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context." Amchem, 521 U.S. at 620 (citation omitted); see Id. "[I]f a fairness inquiry under Rule 23(e) controlled certification, eclipsing Rule 23(a) and (b), and permitting class designation despite the impossibility of litigation, both class counsel and court would be disarmed." Id. at

621. Thus, it is important to "apply[] the class certification requirements of Rules 23(a) and (b)

separately from [the] fairness determination under Rule 23(e)." In re Prudential Ins. Co., 148

F.3d at 308.

The parties have stipulated to the certification, for settlement purposes only, of the

following Rule 23(b)(3) class:

> All persons or entities who purchased or otherwise acquired (i) OPT securities between January 14, 2014 and July 29, 2014; and/or (ii) purchased or otherwise acquired OPT securities pursuant to and/or traceable to OPT's April 4, 2014 follow-on stock offering. Excluded from the Class are Defendants, all directors and officers of OPT during the Class Period, and any family member, trust, company, entity or affiliate controlled or owned by any of the excluded persons and entities referenced above.

Preliminary Approval Order at ¶4.

## A. Rule 23(a) Factors

The Court first determines whether Plaintiffs have satisfied the prerequisites for

maintaining a class action as set forth in Rule 23(a).

## 1. Numerosity

With respect to numerosity, a party need not precisely enumerate the class members to

proceed as a class action.  In re Lucent Tech. Inc., Sec. Litig., 307 F. Supp. 2d 633, 640 (D.N.J.

2004).  "No minimum number of plaintiffs is required to maintain a suit as a class action, but

generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40,

the first prong of Rule 23(a) has been met."  Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir.

2001) (citing 5 James Wm. Moore et al., Moore's Federal Practice S 23.22[3][a] (Matthew

Bender 3d ed. 1999)).

Here, while the precise number of Settlement Class Members is unknown, the number

certainly exceeds any number considered practical for joinder. "Impracticability does not mean

impossibility, but rather that the difficulty or inconvenience of joining all members of the class calls for class certification." *Weikel v. Tower Semiconductor, Ltd.*, 183 F.R.D. 377, 388 (D.N.J. 1998) (citation omitted). "There are no specific standards regarding class size and it is not necessary for a plaintiff to allege the exact number of class members to satisfy the numerosity requirement." *In re Centocor, Inc. Sec. Litig. III*, No. 98-260, 1999 WL 54530, at *1 (E.D. Pa. Jan. 27, 1999) (citation omitted); *Zinberg v. Wash. Bancorp, Inc.*, 138 F.R.D. 397, 405 (D.N.J. 1990). Here, and as alleged in the Third Amended Class Action Complaint, as of August 31, 2014 the Company had approximately 17.5 million shares outstanding. Therefore, Plaintiff's Counsel believes there are thousands of members in the proposed Class and thus the threshold for a presumption of impracticability is met.

**2. Commonality**

Commonality requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The threshold for establishing commonality is straightforward: "[t]he commonality requirement will be satisfied if the named plaintiffs share at least <u>one</u> question of fact or law with the grievances of the prospective class." <u>In re Schering Plough Corp. ERISA Litig.</u>, 589 F.3d 585, 596-97 (3d Cir. 2009) (quoting <u>Baby Neal v. Casey</u>, 43 F.3d 48, 56 (3d Cir. 1994)) (emphasis added). Indeed, as the Third Circuit pointed out, "[i]t is well established that only one question of law or fact in common is necessary to satisfy the commonality requirement, despite the use of the plural 'questions' in the language of Rule 23(a)(2)." <u>In re Schering Plough</u>, 589 F.3d at 97 n.10. Thus, there is a low threshold for satisfying this requirement. <u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 183 (3d Cir. 2001); <u>In re Sch. Asbestos Litig.</u>, 789 F.2d 996, 1010 (3d Cir. 1986) (highlighting that the threshold of commonality is not high (quotations and citations omitted)).

Moreover, this requirement does not mandate that all putative class members share identical claims, see Hassine v. Jeffes, 846 F.2d 169, 176-77 (3d Cir. 1988), and that "factual differences among the claims of the putative class members do not defeat certification." Baby Neal, 43 F.3d at 56.  In that regard, class members can assert a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are subject to the same harm will suffice. Hassine, 846 F.2d at 177-78. "Even where individual facts and circumstances do become important to the resolution, class treatment is not precluded."  Baby Neal, 43 F.3d at 56.

Courts will usually find commonality if the plaintiffs charge defendants with a common course of misconduct – particularly where, like here, the misrepresentations appeared in the Defendants' public statements that were disseminated to all investors. See, e.g., In re Schering-Plough Corp./ENHANCE Sec. Litig., No. CIV.A. 8-397 DMC/JAD, 2012 WL 4482032, at *4 (D.N.J. Sept. 25, 2012). This case presents numerous questions of law and fact that are common to all Settlement Class Members, including:

> a)      Whether the federal securities laws were violated by Defendants' acts as alleged in the Third Amended Complaint;
>
> b)      Whether the price of OPT securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and
>
> c)      Whether the members of the Class have sustained damages, and if so, what is the proper measure of damages?

**3. Typicality**

Rule 23(a)(3) requires that the representative's claim be typical of those of the members of the class. "The concepts of commonality and typicality are broadly defined and tend to merge,

because they focus on similar aspects of the alleged claims."  Newton, 259 F.3d at 182.  "Both criteria seek to assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented."  Baby Neal, 43 F.3d at 56; see General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982). Despite their similarity, commonality – like numerosity – evaluates the sufficiency of the class itself, and typicality – like adequacy of representation – evaluates the sufficiency of the named plaintiff. See Hassine, 846 F.2d at 177 n.4; Weiss v. York Hosp., 745 F.2d 786, 810 (3d Cir. 1984), cert. denied, 470 U.S. 1060 (1985).

Specifically, Rule 23(a)(3) requires that "the claims . . . of the representative parties [be] typical of the claims of the class."  See Fed. R. Civ. P. 23(a)(3).  Typicality acts as a bar to class certification only when "the legal theories of the named representatives potentially conflict with those of the absentees."  Georgine v. Amchem Prods., 83 F.3d 610, 631 (3d Cir. 1996); Newton, 259 F.3d 183.  "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences."  Id. at 184.  In other words, the typicality requirement is satisfied as long as representatives and the class claims arise from the same event or practice or course of conduct and are based on the same legal theory.  Brosious v. Children's Place Retail Stores, 189 F.R.D. 138, 146 (D.N.J. 1999); Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 923 (3d Cir.1992) ("Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and it is based on the same legal theory.").

Here, typicality is clearly satisfied since Plaintiff's claims arise from the same course of conduct that gave rise to the claims of all other Settlement Class Members and are based on the same legal theory. Thus, the typicality requirement of Rule 23(a)(3) is met.

## 4. Adequacy

A class may not be certified unless the representative class members "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Rule 23(a)'s adequacy of representation requirement 'serves to uncover conflicts of interest between named parties and the class they seek to represent.'" In re Pet Food Prod. Liab. Litig., 629 F.3d 333, 343 (3d Cir. 2010) (quoting Amchem, 521 U.S. at 625).  Class representatives "must be part of the class and possess the same interest and suffer the same injury as the class members." Id. (citation and internal quotation marks omitted).

This requirement has traditionally entailed a two-pronged inquiry: first, the named plaintiff's interests must be sufficiently aligned with the interests of the absentees; and second the plaintiff's counsel must be qualified to represent the class. General Motors, 55F.3d at 800; Newton, 259 F.3d at 187 (same). A named plaintiff is "adequate" if his interests do not conflict with those of the Class. In re Prudential Ins. Co., 148 F.3d at 312. Pursuant to Rule 23(g), adequacy of class counsel is considered separately from the determination of the adequacy of the class representatives. Both prongs of the adequacy requirement are satisfied here.

## (i) Adequacy of the Proposed Class Representative

Lead Plaintiff has no interests that are antagonistic to those of the members of the proposed Class and has no unique defenses from the proposed Class. Lead Plaintiff is alleged to have suffered injury in the same manner as other class members as a result of Defendants' alleged misrepresentations. Lead Plaintiff is therefore an adequate representative of the class.

**(ii) Rule 23(g) Adequacy of the Proposed Class Counsel**

Rule 23(g) requires a court to assess the adequacy of proposed class counsel. To that end, the court must consider the following: (1) the work counsel has done in identifying or investigating potential claims in the action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. Nafar v. Hollywood Tanning Sys., Inc., No. 06-CV-3826 DMC, 2008 WL 3821776, at *7 (D.N.J. Aug. 12, 2008). Lead Counsel, Levi & Korsinsky, is highly specialized in the field of securities class action litigation, and has efficiently conducted the motion practice and settlement negotiations involved in this proceeding, and is therefore qualified to represent the Settlement Class.

**B. Rule 23(b)(3) Factors: Common Questions Predominate and the Class Is Superior to Other Methods of Adjudication**

After meeting the threshold requirements of Rule 23(a), a plaintiff must establish that the proposed class meets the requirements of Rule 23(b)(3). To certify a class under Rule 23(b)(3), the Court must find that: [T]he questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Rule 23(b)(3) requires that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In this case, both considerations weigh in favor of class certification.

Here, Lead Plaintiff satisfies the predominance and superiority criteria of Rule 23(b)(3). In determining whether common questions predominate, courts have focused on the claims of liability against defendants. See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).

Smith, 2007 WL1217980, at * 9 (citing cases)("The focus of the predominance inquiry is on liability, not damages."). When common questions are a significant aspect of a case and they can be resolved in a single action, class certification is appropriate. See 7A Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d, § 1788, at 528 (1986).

In this securities action, Defendants' alleged liability arises from OPT's and Defendant Dunleavy's issuance of false and misleading statements concerning the effectiveness of the PowerBuoy. Whether Defendants' publicly disseminated press releases, statements, and/or SEC filings during the Settlement Class Period omitted and/or misrepresented material facts is the central issue in this case and predominates over any individual issue that theoretically might arise.

Here, the existence of common questions and their predominance over individual issues are exemplified by the fact that if every class member were to bring an individual action, each plaintiff would be required to demonstrate the same omissions or misrepresentations to prove liability. Thus, this case is an example of the principle that the predominance requirement is "readily met" in many securities class actions. Amchem, 521 U.S. at 625. The Rule sets out several factors relevant to the superiority inquiry: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.  Essentially, the superiority requirement "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." In re Prudential Ins. Co., 148 F.3d at 316 (internal citations and quotations

omitted); In re Warfarin, 392 F.3d at 532-33.  Many, if not most, of the Class members are individuals for whom prosecution of a costly damages action on their own behalf is not a realistic or efficient alternative. The District of New Jersey is an appropriate forum because all Defendants reside here.

As to Rule 23(b)(3)(D), there will be no difficulties in managing this Settlement Class. This Court balances the fairness and efficiency of certifying a class against other possible methods of adjudication. Without a class action, investors who have been defrauded by securities law violations but whose losses do not run into several million dollars would likely have no practical recourse. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985) ("[m]ost of the plaintiffs would have no realistic day in court if a class action were not available.") And if individuals do have the means to litigate their own action, absent a class action, this Court might have to try numerous lawsuits. Good v. Nationwide Credit, Inc., No. CV 14-4295, 2016 WL 929368, at *8 (E.D. Pa. Mar. 14, 2016); see also Smilow, 323 F.3d at 41 ("The core purpose of Rule 23(b)(3) is to vindicate the claims of … groups of people whose individual claims would be too small to warrant litigation"). Thus, a class action is the superior method of adjudication and satisfies Rule 23(b)(3).

Moreover, solely for the purposes of settlement, Defendants do not dispute that the Class should be certified in accordance with Rule 23(b)(3).

Finally, when confronted with a request for settlement-only class certification, the Court need "not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." Amchem, 521 U.S. at 620.

Having weighed all the factors and considered all the requirements of class certification, the Court finds that it is appropriate to certify the class for settlement purposes.

## VI. ADEQUACY OF NOTICE

The Court ruled in the Preliminary Approval Order that the class-notice materials and the proposed method of dissemination (by first-class mail and publication) met the requirements of due process, Rule 23 of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), "constitute[d] the best notice practicable under the circumstances, and constitute[d] due and sufficient notice to all persons entitled to such notice." Now that notice has been provided to the Class, the Court reaffirms its earlier findings concerning the adequacy of the Notice Program.

Where, as here, the parties have sought simultaneously to certify a settlement class and settle a class action, the Court must consider Fed. R. Civ. P. 23(c)(2)'s notice requirements for class certification as well as Rule 23(e)'s notice requirements for settlement or dismissal. See, e.g., In re Prudential Ins. Co., 148 F.3d at 326-27.

For classes certified under Fed. R. Civ. P. 23(b)(3), such as the Class in this action, Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." The Rule also prescribes that the notice state "(i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on class members under Rule 23(c)(3)." Id. Rule 23(e) is less specific, requiring only that notice of a proposed settlement be given "in a reasonable manner." Thus, if the notice satisfies Rule 23(c), it will also satisfy Rule 23(e). See, e.g., In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 448 (S.D.N.Y. 2004). The

Constitution's Due Process Clause also imposes certain minimum notice requirements.  As the Supreme Court has observed, however, the "'mandatory notice pursuant to [Rule 23(c)(2)] . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject.'"  Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 173-74 (1974) (quoting Fed. R. Civ. P. 23, 1966 Amendment Advisory Comm. Note to Subdiv. (d)(2)). Due process considerations are therefore satisfied if the notice conforms to Rule 23(c)(2).

Additionally, the Securities Act, in provisions added by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), imposes certain notice requirements specifically for settlements of securities class actions.  See 15 U.S.C. § 77z-1.  The PSLRA requires that the notice contain the following information:

- Statement of recovery – "[t]he amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis";

- Statement of potential outcome of case – the amount of damages per share recoverable if the plaintiffs were to prevail on every claim, but, if the parties are unable to agree on damages, "a statement from each settling party concerning the issue or issues on which the parties disagree";

- Statement of attorneys' fees – a statement of fees and costs to be applied for in the aggregate and on an average per-share basis;

- Identification of lawyers' representatives – the name, telephone number, and address of counsel available to answer questions; and

- Reasons for settlement – "[a] brief statement explaining the reasons why the parties are proposing the settlement."

18

*Id.*  The notice must also include a cover page summarizing all of these topics.  *Id.*

**A. Best Practicable Notice Methodology**

Rule 23(e)(1)(B) requires the Court to direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise. The notice procedure sought to reach the greatest number of Class members possible. Pursuant to the Preliminary Approval Order, the Claims Administrator disseminated 19,525 Notice Packets to potential Class members and nominees. Peters Decl. at ¶8. In addition, the Claims Administrator published the Summary Notice on the national edition of *PR Newswire* on July 1, 2016 and, since that same date, has been administrating a 24-hour/7-days-per-week website and Toll Free Phone Service to field OPT shareholder questions. Peters Decl. at ¶¶9-16. As of October 31, 2016, the deadline for timely objections, Lead Plaintiff had received one objection from Objector Daniell. Objector Daniel indicated at the November 14 hearing that he had recently moved, but was able to obtain a copy of the class notice from the administrator's website.

This notice program was clearly "the best notice practicable under the circumstances including individual notice to all members who can be identified through reasonable effort," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974), and meets the requirements of Fed. R. Civ. P. 23(c) and (e) and due process. *See, e.g.*, see *Zimmer Paper Products, Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) ("It is well settled that in the usual situation firstclass mail and publication fully satisfy the notice requirements of both Fed. R. Civ. P. 23 and the due process clause.").

**B. Sufficient Content of the Notice**

The potential Class Members will have received the "best notice that is practicable under the circumstances" as required by Rule 23(c)(2) if the notice "contain[s] sufficient information to enable class members to make informed decisions on whether they should take steps to protect their rights, including objecting to the settlement or, when relevant, opting out of the class." <u>In re Nat'l Football League Players Concussion Injury Litig.</u>, 821 F.3d 410, 435 (3d Cir. 2016) (internal quotations omitted).

Here, the Notice detailed the Settlement and the releases that would be exchanged; summarized the history of the litigation; described the parties and the Class; discussed the settlement negotiations; detailed the Plan of Allocation; detailed the procedure for filing Proofs of Claim and provided the deadline for filing (October 31, 2016); detailed the maximum amount that Plaintiff's Counsel would seek in attorneys' fees (33%) and reimbursement of expenses for prosecuting the Action ($25,000); detailed the reasons for the settlement; described Class members' right to request exclusion from the Class or appear through personal counsel of their choosing and/or to object to the Settlement, Plan of Allocation and/or request for attorneys' fees and reimbursement of expenses; provided the deadlines for asserting these rights (October 31, 2016) and procedures for doing so; provided the date, time, and location of the Final Approval hearing and that Settlement Class Members have the right to attend and be heard; and provided addresses, a toll-free telephone number and a website where Class members could obtain additional information. The Notice also contained a statement of the average per share amount that the Settlement represents to the total number of damaged shares in the Class; a statement that there is no agreement on the amount of damages; identification of the attorneys for the class; and

the reasons for the Settlement. Accordingly, the notice to the Class met all requirements of Rule

23(c) and (e), 15 U.S.C. §78u-4(a)(7) of the PSLRA, and due process.

## VII. FINAL APPROVAL OF SETTLEMENT

At the outset, the Court expresses that the law encourages and favors settlement of civil

actions in federal courts, particularly in complex class actions.  In re Warfarin, 391 F.3d at 535;

see In re General Motors, 55 F.3d 768, 784 (3d Cir. 1995)("the law favors settlement,

particularly in class actions and other complex cases where substantial judicial resources can be

conserved by avoiding formal litigation").  Accordingly, when a settlement is reached on terms

agreeable to all parties, it is to be encouraged.  Bell Atlantic Corp. v. Bolger, 2 F.3d 1304, 1314

n.16 (3d Cir. 1993). The Third Circuit applies "an initial presumption of fairness in reviewing a

class settlement when:  (1) the negotiations occurred at arms [sic] length; (2) there was sufficient

discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only

a small fraction of the class objected."  In re Nat'l Football League, 821 F.3d at 436 (internal

quotations omitted).  This presumption applies even where, as here, "the settlement negotiations

preceded the actual certification of the class . . . ."  In re Warfarin Sodium Antitrust Litig., 391

F.3d 516, 535 (3d Cir. 2004).

This action was actively litigated since its inception in June 2014 before an agreement-

inprinciple was reached in April 2016 to resolve the Litigation. The Settlement resulted from

arm's-length negotiations between highly experienced and capable counsel after significant

investigation and litigation, with the substantial assistance of Mr. Bruce Friedman, Esq. The

principal lawyers involved in the settlement negotiations are all well known for their effective

representation of their clients, and have many years of experience in the prosecution, defense,

and resolution of complex securities actions. Importantly, the parties only reached an

agreementin principle to settle after a full-day formal mediation session followed by a number of telephonic negotiation sessions with Mr. Bruce Friedman, Esq. Declaration of Nicholas I. Porritt (the "Porritt Decl.") at ¶¶29-32. "'[T]he participation of an independent mediator in settlement negotiations virtually insures [sic] that the negotiations were conducted at arm's length and without collusion between the parties.'" *ViroPharma*, 2016 U.S. Dist. LEXIS 8626, at *24 (citation omitted); *Bredbenner v. Liberty Travel, Inc.*, 09-905, 2011 WL 1344745, at *10 (D.N.J. Apr. 8, 2011) (independent mediator's involvement in settlement negotiations "virtually insures that the negotiations are conducted at arm's length and without collusion between the parties"); *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("[A] . . . mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure.").

Nevertheless, a class action settlement may not be approved under Rule 23(e) without a determination by this Court that the proposed settlement is "fair, reasonable and adequate." <u>See In re Cendant</u>, 264 F.3d at 231; <u>see</u> <u>also</u> Fed. R. Civ. P. 23(e)(1)(A). The Third Circuit has on several occasions stressed the importance of Rule 23(e), noting that "the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members." <u>In re General Motors</u>, 55 F.3d at 785 (citations and quotations omitted); <u>see</u> <u>also</u> <u>Amchem</u>, 521 U.S. at 623 (noting that the Rule 23(e) inquiry "protects unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise") (citations omitted). However, in cases such as this, where settlement negotiations precede class certification and approval for settlement and certification are sought simultaneously, the Third Circuit requires district courts to be even "more scrupulous than usual" when examining the

fairness of the proposed settlement.  See In re General Motors, 55 F.3d at 805. This heightened standard is intended to ensure that class counsel has engaged in sustained advocacy throughout the course of the proceedings, particularly in settlement negotiations, and has protected the interests of all class members. See In re Prudential Ins. Co., 148 F.3d at 317.

As this Court observed earlier, the Third Circuit has articulated a set of nine "Girsh factors" that courts should consider when determining the fairness of a proposed settlement:

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible

recovery; [and]

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all

the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotations omitted); see, e.g., In re Johnson & Johnson Deriv. Litig., 900 F. Supp. 2d 467, 479-85 (D.N.J. 2012) (reciting and applying the Girsh factors). "The settling parties bear the burden of proving that the Girsh factors weigh in favor of approval of the settlement." In re Pet Food Prods., 629 F.3d at 350. "A district court's findings under the Girsh test are those of fact." In re Nat'l Football League, 821 F.3d at 437, as amended (May 2, 2016).

Since <u>Girsh</u>, the Third Circuit has held that, "because of a 'sea-change in the nature of class actions' after <u>Girsh</u> was decided thirty-five years ago, it may be helpful to expand the <u>Girsh</u> factors to include, when appropriate, the following non-exclusive factors":

> [1] [T]he maturity of the underlying substantive issues . . . ; [2] the existence and probable outcome of claims by other classes and subclasses; [3] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants; [4] whether class or subclass members are accorded the right to opt out of the settlement; [5] whether any provisions for attorneys' fees are reasonable; and [6] whether the procedure for processing individual claims under the settlement is fair and reasonable.

<u>In re Pet Food Prods.</u>, 629 F.3d at 350 (quoting <u>In re Prudential Ins. Co.</u>, 148 F.3d at 323). "Unlike the <u>Girsh</u> factors, each of which the district court must consider before approving a class settlement, the <u>Prudential</u> considerations are just that, prudential." <u>In re Nat'l Football League Players</u>, 821 F.3d at 437 (internal quotations omitted). The <u>Girsh</u> and <u>Prudential</u> factors are well established law and their continued application in the class settlement context has been reaffirmed by Third Circuit as recently as April of this year. <u>See</u> <u>In re Nat'l Football League Players</u>, 821 F.3d at 437.

The proposed settlement here satisfies the <u>Girsh</u> factors as well as the applicable <u>Prudential</u> considerations.

**A. Complexity, Expense, and Likely Duration of Litigation**

The first <u>Girsh</u> factor captures "the probable costs, in both time and money, of continued litigation." <u>In re Gen. Motors</u>, 55 F.3d at 812. "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." <u>Id.</u> "Settlement is

favored under this factor if litigation is expected to be complex, expensive and time consuming." In re Royal Dutch/Shell Transp. Sec. Litig., 2008 WL 9447623, at *17 (D.N.J. Dec. 9, 2008). If not for this Settlement, the case would have continued to be fiercely contested by all parties. While Plaintiff's Counsel have already expended substantial amounts of time and money to reach the point of settlement, further significant time and expenses would be incurred to complete pre-trial proceedings and conduct a trial. Moreover, even if the jury returned a favorable verdict after trial, there is no question that any verdict would be the subject of numerous post-trial motions and a complex multi-year appellate process. This is especially true because only a few Private Securities Litigation Reform Act of 1995 ("PSLRA") cases have proceeded to trial, and many of the issues specific to the application and effect of certain provisions of the PSLRA are novel, with little or no appellate authority interpreting them. Taking into account the likelihood of appeals, absent this Settlement, this case likely would have continued for years despite the best efforts of the Court and the parties to speed the process.

Thus, "[i]t is safe to say, in a case of this complexity, the end of that road might be miles and years away." *In re Chambers Dev. Sec. Litig.*, 912 F. Supp. 822, 837 (W.D. Pa. 1995). As a result, the Settlement secures a substantial and certain recovery for the Class undiminished by further expenses and without the delays, risks, and uncertainties of continued litigation.

Even if the Class recovered a larger judgment after trial, which is certainly not guaranteed, the additional delay, through summary judgment, trial, post-trial motions, and the appellate process, would deny the Class any recovery for years. The Settlement secures a substantial and certain benefit for the Class in this highly complex and contested action, undiminished by further expenses, and without the delay, risk, and uncertainty of continued litigation. *See, e.g., Prudential Sales*, 148 F.3d at 318 (settlement was favored where "the trial of

25

this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court").

This factor supports approval.

## B. Class's Reaction to Settlement

The second *Girsh* factor "gauge[s] whether members of the class support the settlement." In re Prudential Ins. Co., 148 F.3d at 318. A lack of significant objections by class members weighs in favor of approving the settlement. In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 578 (E.D. Pa. 2003)("unanimous approval of the proposed settlement[ ] by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlement."); see also Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1313, n.15 (3d Cir. 1993) (stating that "silence constitutes tacit consent to the agreement" where 30 objectors out of approximately 1.1 million shareholders was considered an "infinitesimal number").

The deadline to object to the settlement in this case was October 31, 2016. Here, 19,525 notices of the Settlement were mailed to potential Class Members, a summary notice was published on the *PR Newswire*, and settlement documents were posted on the Claims Administrator's website. Peters Decl. at ¶¶8, 9, 16.  To date only one objection has been filed to the settlement. "The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factors weighs in favor of the Settlement." *Cendant*, 264 F.3d at 235.

Although the Court found that the reaction of the Settlement Class has been favorable overall, supporting final approval, the Court, nevertheless, heard argument from Objector Daniell and addressed the concerns raised by his objections to the settlement at the November 14

hearing. Although the Court set forth its reasoning on the record at length, I will briefly reiterate it below.

    As an initial matter, Lead Plaintiff initially challenged Objector Daniell's standing to object on the basis of his failure to provide proof of claim and documentary proof to the Settlement Administrator. In response, Objector Daniell has provided the Court with copies of trade notifications for purchases executed during the class period and testified, under oath, at the November 14 hearing that he was the sole beneficial owner of the account on behalf of which the trades were executed, that he had documentary proof of ownership on his home computer, and that he had mailed by regular first class mail documentary proof of ownership to the claims administrator in this case on October 29, 2016. Considering Objector's testimony and the attached trade notifications, the Court is satisfied that Objector is at least alleged to have purchased 211,097 shares of Ocean Power common stock at a cost of $870,871.62 between March 14 and March 27, 2014 — during the class period. Lead Counsel also stated on the record that Objector had at least made a prima facie showing of ownership. Objector thus has standing to object to the proposed settlement. The Court instructed Objector Daniell to resubmit his proof of claim directly to Lead Counsel, because, as of the date of the hearing, Lead Plaintiff represented that the claims administrator had not received Objector's proof of claim. Objector Daniell raised four objections to the settlement.

    First, Objector Daniell asserted that Plaintiff's counsel performed an inadequate investigation into the claims and defenses being asserted in this action. Objector Daniell asserted that Lead Plaintiff failed to accuse Ocean Power of issuing false and/or misleading press releases for the purpose of inflating its stock price or procuring government grants, which resulted in a lower recovery in the settlement. *Id*. at 3, 6-8.  This Court disagrees, as Plaintiffs' Third

27

Amended Class Action Complaint (the "Complaint") identified numerous press releases alleged to be false and/or materially misleading.

For example, the Third Amended Complaint challenged press releases related to Ocean Power's utility-scale "Power Buoy," development milestones Ocean Power supposedly achieved in connection with the utility-scale "Power Buoys," Ocean Power's receipt of funding from the Australian government, and Ocean Power's ability to raise capital from private investors through public offerings. *See*, *e.g.*, Complaint at ¶¶49-50, 51-52, 112-13, 114, 117, 120, 178-79, 187. With regard to each of these statements, Plaintiff argued why they were false or misleading and alleged that these statements were made with scienter. *See*, *e.g.*, Complaint at ¶¶76-78, 81, 83, 85-86, 95, 99-102, 105. Each of these factual allegations supported Plaintiff's theory of the case—that Ocean Power allegedly misrepresented the status of its business in order to generate additional investment. Objector Daniell's position that these allegations are inadequate or should have been supplemented with additional allegations is unpersuasive.

The Court also rejects Objector Daniell's argument that additional allegations would have netted a better settlement. The proposed settlement represents a recovery of approximately 15% of total shareholder damages. Specifically, Plaintiff's expert estimated total damages of $18,913,149 for the claims under the Exchange Act and $6,999,389 for claims under the Securities Act. Porritt Decl. at ¶ 66. The cash settlement alone, therefore, represents a recovery of almost 12% of the total damages that Lead Plaintiff's expert estimated could have been recovered if Plaintiffs were completely successful on all issues of liability and damages in the action. Id. Additionally, Lead Plaintiff represents that, as of November 4, 2016, the 380,000 shares of OPT stock called for in the settlement have a market value of approximately $836,000, another 3% of the total potential recovery. Dkt. No. 90, p. 1.

As the Court will address in its discussion of range and reasonableness, this is well above the 8.6% median settlement value of cases with similar investor losses according to NERA Economic Consulting's "Recent Trends in Securities Class Action Litigation: 2015 Full-Year Review," and above the median in cases with similar investor losses according to Cornerstone Research's analysis in "Securities Class Action Settlements: 2015 Review and Analysis." Lead Plaintiff has submitted excerpts from both reports for the Court's consideration. In the absence of any contradictory support from Objector Daniell, this Court cannot agree with his assertion that the proposed settlement is "less than half of standard settlements in securities fraud cases." Objection at 12.

Moreover, as the Court will discuss in its consideration of the <u>Prudential</u> factors, there were adequate opt-out rights in this case, such that if Objector Daniell were dissatisfied with Plaintiff's prosecution of the case, he would have been free to opt-out of the class and pursue his claims individually. Having failed to do so, his belated criticism of Plaintiff's litigation strategy is not well taken.

Second, Objector Daniell asserted that the settlement and plan of allocation "fail to account" for a reverse 10:1 stock split that Ocean Power executed on October 28, 2015. Objection at 13. Objector Daniell appeared to argue that payouts under the settlement and plan of allocation will be affected by the reverse stock split, such that class members who held onto their stocks until after the split will be disadvantaged relative to class members, like Lead Plaintiff FiveMore, who sold their shares before the split. The Plan of Allocation sets forth a matrix in which estimated per share recovery can be found by selecting a row based upon the time within the class period in which shares were purchased and a column based upon the time period in which shares were sold.  See Plan of Allocation, Dkt. No. 87-1, p. 4. Objector Daniell claims to

have purchased OPT shares in March 2014. From the matrix in the Plan, therefore, it would appear that someone in Objector's position could expect to reclaim $1.18/share if the shares were sold any time after July 29, 2014. Objector's argument thus appeared to be that those class members selling after the October 28, 2015 reverse stock split will only be able to recover one tenth the amount per share as those, like FiveMore, who sold before the reverse split because they will only be awarded $1.18 per share sold after July 29, 2014 (including the period after October 28, 2015), and, after the reverse split, they will only be able to sell one tenth the number of shares that they originally purchased during the class period.

Lead Plaintiff responded that "[a]n individual's recoverable loss under the plan of allocation is not affected by whether he or she sold stock after the end of the class period." Dkt. No. 90, p. 11. The Court agrees that this is the plain reading of the Plan of Allocation. It is clear that the per share recovery detailed in the Plan of Allocation refers to recovery per share purchased during the class period. The challenged reverse stock split, taking place over a year after the close of the class period, has no effect on the number of purchased shares for which class members may be compensated.

Third, referring once again to the reverse stock split, Objector Daniell argued that the notice documents sent to potential class members misstate the number of Ocean Power shares provided under the terms of the settlement. Objection at 14. Objector Daniell read Paragraph 2.2 of the Stipulation of Settlement as allowing Ocean Power to reduce the number of shares to be provided in the settlement in light of the reverse stock split that occurred in October 2015. Objection at 15 (quoting Stipulation of Settlement [Dkt. 81] ¶ 2.2)  ("However, the number of shares constituting the OPT Settlement Stock will be adjusted to account for stock splits, reverse stock splits and other similar action taken by OPT before distribution to Class Members.").

Because the reverse split was 10:1, Objector Daniell argued that Defendant Ocean Power will be able to provide only 38,000 shares to satisfy the settlement, instead of the called for 380,000.

Lead Plaintiff contended that the October 2015 reverse split did not affect the number of shares that will be paid as part of the settlement. In support of its contention, Lead Plaintiff has provided Defendant Ocean Power's form 10-Q from September 2016, which states that the number of shares to be provided remains 380,000. See, e.g., Ocean Power Form 10-Q dated September 12, 2016, pp. 19, 35 ("The Stipulation provides, among other things, for a settlement payment by or on behalf of the Company of $3,000,000 in cash . . . and the issuance by the Company of 380,000 shares . . . ."). As form 10-Qs are certified by the filing company to be accurate and complete, this Court is satisfied that ¶ 2.2 of the Stipulation of Settlement cannot be read to allow for a reduction in the number of shares to be paid as part of the settlement. Furthermore, the Court confirmed on the record at the November 14 hearing that this is the correct interpretation of the stipulation, and that, indeed, 380,000 shares of OPT stock will be part of the common fund to be distributed to class members, based upon the plan of allocation.

Fourth and finally, Objector Daniell asserted that Lead Plaintiff failed to adequately represent the class. Objector Daniell's argument appeared to be that Lead Plaintiff FiveMore is not a sophisticated investor, as evidenced by poor investment decisions in the past, and that Lead Plaintiff sold a significant portion of its shares in Defendant Ocean Power in October 2015, before the reverse stock split, causing its interests to fall out of alignment with other class members retaining their shares. As to the first point, whether Lead Plaintiff FiveMore has consistently made wise investment choices has no bearing on its ability to represent a class in a securities fraud case in which it alleges to have suffered the same injury, in the same manner as other members of the class. As to the second point, because Lead Plaintiff has demonstrated and

represented on the record that the October 2015 stock split had no impact on either the number of shares for which class members may be compensated or the number of shares to be paid by Defendants as part of the settlement, Objector has not raised any basis for a conflict of interest between Lead Plaintiff and the class that would undermine this Court's adequacy finding.

In addition to opposing Objector Daniell's submission, Lead Plaintiff also asks this Court to take note of Objector Daniell's status as a "professional objector," motivated primarily by a desire to obtain money in addition to any pro rata amount to which he might be entitled under the plan of allocation, which is prohibited under the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act of 1995. *See* 15 U.S.C. §78u-4(a)(2)(A)(vi). In support of its contention, Lead Plaintiff has attached copies of correspondence between Lead Counsel and Objector Daniell in which Objector Daniell appears to offer not to object to the settlement in exchange for Defendant Ocean Power separately compensating Objector Daniell for his losses. Lead Plaintiff also asks the Court to take judicial notice of Objector Daniell's objections in In re Sourcefire, Inc. Shareholder Litigation, No. 13-cv-02271-JFM, Dkt. No. 60 (D. Md. April 4, 2014); Williams v. LA Fitness Int'l LLC, No. BC385623 (L.A. County Sup. Ct. March 22, 2010); and Kim v. Leap Wireless International, No. 37-2013-58491-CU-BT-CTL (San Diego County Sup. Ct. October 27, 2014).

As an initial matter, Objector Daniell seeks to exclude the correspondence between Objector and Lead Counsel, Lead Plaintiff, and others as settlement communications under Fed. R. Evid. 408. Rule 408 does not apply to the correspondence at issue here. As the Third Circuit has long held:

> The application of the rule is limited to evidence concerning settlement or compromise of a claim, where the evidence is offered to establish liability, or the validity or amount of the claim. Additionally, Rule 408 has been interpreted as applicable to an actual dispute,

or at least an apparent difference of view between the parties concerning the validity or amount of a claim.

Affiliated Mfrs., Inc. v. Aluminum Co. of Am., 56 F.3d 521, 526 (3d Cir. 1995). Rule 408 does not apply to Objector's correspondence with Lead Plaintiff, therefore, because it does not relate to the settlement or compromise of any claim or actual dispute between the parties. Objector and Lead Plaintiff are aligned in this case in seeking recovery from Defendants. Objector does not purport to have a claim against Lead Plaintiff, instead, only threatening to attempt to delay the settlement in this case as a putative class member. Moreover, even were the communications at issues "settlement communications" as Objector Daniell contends, this Court would be permitted to consider them in evaluating the reasonableness of the settlement in this case, as a purpose not proscribed by the Rule. See Lohman v. Duryea Borough, 574 F.3d 163, 167 (3d Cir. 2009) ("Rule 408 does not bar a court's consideration of settlement negotiations in its analysis of what constitutes a reasonable fee award in a particular case. By its terms, Rule 408 requires exclusion of evidence of such negotiations when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction."); id. at 167-68 (such communications may be used to evaluate the relative success of the litigation in evaluating the reasonableness of settlements).

Turning to Lead Plaintiff's argument, it is true that the "[f]ederal courts are increasingly weary of professional objectors." In re Royal Dutch/Shell Transp. Sec. Litig., No. CIV.A. 04-374 JAP, 2008 WL 9447623, at *30 (D.N.J. Dec. 9, 2008) (quotation omitted). Class action settlements are more and more frequently delayed by "'canned' objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests." Devlin v. Scardelletti, 536 U.S. 1, 23 (2002) (Scalia, J., dissenting) (quotation

omitted). *See also In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010) (professional objectors "undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients." Yet, the courts in this district have "still given these objections full consideration." Varacallo v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 240 (D.N.J. 2005). As is often the case in matters raised by serial or professional objectors, however, this Court has found that "the substance of all of the objections submitted to the Court are without merit." *Id.*  For example, the substance of his first objection is that Lead Counsel failed to adequately litigate this case. In his first electronic mail message to Lead Counsel on May 23, 2016, however, Objector Daniell stated "I've reviewed the settlement in this case. Let me state at the outset that I have no desire to do anything that could prevent or delay the settlement of this case or your fee. The case against [Ocean Power] is meritorious and you've litigated it admirably." Lead Plaintiff's Repl. Ex. A. In the same message, Objector Daniell went on to state that his desire in objecting to the settlement was "to work out my concerns over FiveMore/FiveT in this case by way of an agreement separate and apart from the class settlement." Id.

Finally, as the Court observed on the record, Objector Daniell's remaining substantive objections appear rooted in a fundamental misunderstanding of the plan of allocation. Accordingly, his objections are not well taken and are rejected by this Court. Indeed, upon this Court confirming, in open court at the hearing on November 14, that the correct interpretation of the stipulation is that the reverse stock split in October 2015 has no effect on the allocations to be made from the cash portion of the settlement fund, nor does it in any manner diminish the 380,000 shares of OPT stock that will be distributed to class members according to the plan of

allocation, Mr. Daniell withdrew his objections on these bases as well as the adequacy of Lead Plaintiff FiveMore serving as the class representative.

## C. Stage of Proceedings and Amount of Discovery Completed

The goal of the third <u>Girsh</u> factor is to "capture[] the degree of case development that class counsel accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 235 (3d Cir. 2001) (<u>citing General Motors</u>, 55 F.3d at 813). "Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties. . . .  Indeed, courts in this district have approved settlements while the case was in the pre-trial stage and formal discovery had not yet commenced."  <u>In re Johnson & Johnson</u>, 900 F. Supp. 2d at 482; <u>accord, e.g., In re Nat'l Football League</u>, 821 F.3d at 436-37 ("To the extent objectors ask us to require formal discovery before presuming that a settlement is fair, we decline the invitation.  In some cases, informal discovery will be enough for class counsel to assess the value of the class claims and negotiate a settlement that provides fair compensation."). Courts in this Circuit frequently approve class action settlement despite the absence of formal discovery. <u>See, e.g., Schuler v. Medicines Co.</u>, No. CV 14-1149 (CCC), 2016 WL 3457218, at *7 (D.N.J. June 24, 2016) (approving settlement prior to discovery because of counsel's investigation); <u>In re Johnson & Johnson</u>, 900 F. Supp.2d at 483 ("Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties.")

Here, Plaintiff and his counsel had a sufficient understanding of their claims and defenses in this action. Although there has been no formal discovery, Plaintiff's Counsel had ample

information to evaluate the prospects for the Class and to assess the fairness of the Settlement. In this Litigation both the knowledge of Plaintiff and Plaintiff's Counsel and the proceedings themselves reached a stage where an intelligent evaluation of the strengths and weaknesses of the Class's claims and the propriety of the Settlement could be made. By the time the Settlement was reached, Plaintiff's Counsel had the benefit of their extensive pre-filing investigation; opposed Defendants' motion to dismiss; and filed multiple amended complaints. Porritt Decl. at ¶¶16-28. Counsel also participated in a formal mediation session with Mr. Bruce Friedman, Esq. where the strengths and weaknesses of the Class' claims were fully vetted. *Id.* at ¶¶29-36. Prior to the mediation, Plaintiff and Defendants provided written submissions to Mr. Friedman detailing their positions on the liability and damages of the case, and highlighted the factual and legal issues in dispute. There is no question that Plaintiff and Plaintiff's Counsel were in an excellent position to evaluate the strengths and weaknesses of the claims asserted and defenses raised by Defendants, as well as the substantial risks of continued litigation and the propriety of settlement. Having sufficient information to properly evaluate the case, the Litigation was settled on terms highly favorable to the Class. See, e.g., In re Johnson & Johnson, 900 F. Supp. 2d at 482-83 (approving derivative settlement without formal discovery, but where the parties had "engaged in informal sharing of documents" and "extensive motion practice" and where plaintiffs' counsel had reviewed publicly available materials and consulted with experts).

**D. Risks of Establishing Liability and Damages**

"The fourth and fifth [*Girsh*] factors survey the potential risks and rewards of proceeding to litigation in order to weigh the likelihood of success against the benefits of an immediate settlement."  In re Johnson & Johnson, 900 F. Supp. 2d at 483 (internal quotations omitted). "By evaluating the risks of establishing liability, the district court can examine what the potential

36

rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." General Motors, 55 F.3d at 814. In making this assessment, however, "a court should not conduct a mini-trial and must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel." In re Lucent Techs., Inc. Sec. Litig., 307 F. Supp. 2d 633, 644-45 (D.N.J. 2004) (internal quotations omitted). In complex cases, "[t]he risks surrounding a trial on the merits are always considerable." Weiss v. MercedesBenz of N. Am., 899 F. Supp. 1297, 1301 (D.N.J. 1995).

**1. Liability**

While Plaintiff believes that there was a strong case as to liability, as in every complex case of this kind, they faced formidable obstacles to proving Defendants' liability. To establish a §10(b) claim, plaintiffs must prove that defendants: (1) made a misstatement or an omission of a material fact; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiffs reasonably relied; and (5) that proximately caused their injuries. *In re IKON Office Sols., Inc.*, 277 F.3d 658, 667 (3d Cir. 2002).

Plaintiff alleged that Defendants issued false and misleading statements about OPT's products. Specifically, Plaintiff claimed that OPT's utility-scale "Power Buoy" was technologically deficient and incapable of performing in the manner represented by Defendants during the class period. Plaintiff and other members of the Settlement Class purchased OPT common stock based upon these alleged misrepresentations and/or omissions.

Plaintiff maintains that on June 10, 2014, investors began to discover that the status of the Company's products was not as it seemed when OPT announced that it had fired its Chief Executive Officer, Dunleavy, and was commencing a special internal investigation into certain statements made by Dunleavy during his tenure. OPT purportedly released further information

about the true status of its products when, on July 14, 2014, it announced that it was terminating the Company's largest and most important development project, the Victoria Wave Project, and refunding the Australian Government several million dollars in connection therewith. On July 29, 2014, the Company revealed to investors that it was discontinuing development and production of the particular "Power Buoy" product at issue in this lawsuit.

In connection with each of the above disclosures, Plaintiff alleges that he and other members of the Settlement Class sustained damages as a result of OPT's common stock declining in value. On June 10, 2014, OPT's stock price declined by $0.84 per share (34%) on heavier than normal trading volume. On July 14, 2014, OPT's stock price declined by $0.35 per share (23%) on heavier than normal trading volume. By July 29, 2014, OPT's stock price had reached an all-time low of $1.23 per share (down from an intraclass period high of $5.45 per share).

Although progress was made in litigating this case when the parties reached the Settlement, including motion to dismiss briefing, substantial work remained. First, to defeat Defendants' motion to dismiss Plaintiff would have to establish that the Defendants made false or misleading statements with scienter and that the Class is entitled to recover damages under the securities laws as a result of Defendants' conduct. These issues would involve complicated theories, statistical models, and competing experts. While Plaintiff believes they had strong arguments, there is no guarantee of prevailing against Defendants' motion to dismiss.

Additionally, the class had not been certified, and certification was not a foregone conclusion. The risk of non-certification supports the Settlement. *Ikon*, 194 F.R.D. at 181 (E.D. Pa. 2000). Further, the fact and expert discovery process would take several additional months to complete, including exchange of reports, depositions and foreseeable *Daubert* motions. After

completion of all discovery, summary judgment motions would be expected. If the Action went to trial, the parties would then prepare a pre-trial order, propose jury instructions, and file and argue motions *in limine*. The parties would expend significant time preparing this case for a lengthy and complicated trial.

Plaintiff believes that the case has merit and that there was evidence to establish Defendants' liability. Nevertheless, Plaintiff recognizes that, if the prosecution of this action were to continue, there would be substantial risks. For their part, Defendants have denied the material allegations of the Complaint and have vigorously asserted that OPT shareholders have not sustained any damages as a result of the alleged misconduct. In view of these factors, without a settlement, Plaintiff and the Settlement Class face a very real risk in this case that they could recover far less than the Settlement amount—or even nothing—without the Settlement. In all events, protracted and highly complex further litigation without a reasonably predictable outcome would ensue if this case were not resolved at this time. Thus, the Settlement results in significant and immediate recovery, without any further risk, expense and delay that continued litigation would entail and consideration of the risk, expense, complexity and likely duration of this Action supports approval of the Settlement. *See, e.g., Prudential Sales*, 148 F.3d at 318 (settlement was favored where "the trial of this class action would be a long, arduous process requiring great expenditures of time and money on behalf of both the parties and the court"); *In re Delphi Corp. Sec.*, 248 F.R.D. 483, 496 (E.D. Mich. 2008) (discussing "the risk that Defendants could prevail with respect to certain legal or factual issues, which could result in the reduction or elimination of Plaintiff's potential recoveries").

**2. Damages**

Even if Lead Plaintiff were successful in establishing liability, it faced substantial risks in proving loss causation and damages. The determination of damages is a complicated and uncertain process, involving the analysis of many subjective factors. Damages in a §10(b) action are measured by "the difference between the purchase price and the 'true value' of the security [i.e., value absent the fraud] at the time of the purchase." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir. 2000).

Plaintiff must also show that the alleged false statements or omissions caused the damages, or loss causation. *ViroPharma*, 2016 U.S. Dist. LEXIS 8626, at *36. Absent settlement, proving loss causation would be a major risk faced by Plaintiff. The Supreme Court's decision in *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) and the subsequent cases interpreting *Dura* have made proving loss causation even more difficult and uncertain than it was in the past. *See, e.g., In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249, 260 (D.N.H. 2007) ("Proving loss causation would be complex and difficult.").

Plaintiff's Counsel believe that, if they prevailed on the liability issue at trial, they would be able to establish damages in the amount estimated by Plaintiff's damages expert. However, Plaintiff's Counsel are mindful of Defendants' arguments challenging Plaintiff's claims throughout the litigation, as well as the amount of damages. Expert testimony is necessary in order to establish the amount – and, indeed, the existence – of actual damages. Such an expert evaluation is based not only on stock price history but on other more elusive factors including corporate asset value, cash flow, income and growth prospects for the future, industry and economic trends, the quality of management, the nature and amount of liabilities, and many other variables. At trial, Plaintiff would likely have faced a motion *in limine* by Defendants to preclude

Plaintiffs' damage expert's testimony under *Daubert*, and risked a decision that the expert's valuation model might not be admissible in evidence.

If Plaintiff survived the *Daubert* motion, the damage valuations of Plaintiff's and Defendants' experts would vary substantially. In the "battle of experts," it is impossible to predict with any certainty which arguments would find favor with the jury. *See ViroPharma,* 2016 U.S. Dist. LEXIS 8626, at *37; *In re Warner Commc'ns Sec. Litigation*, 618 F. Supp. 735, 744 45 (S.D.N.Y. 1985) (approving settlement where "it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad of non-actionable factors such as general market conditions"). Thus, even if Plaintiff prevailed on the issue of liability, significant additional risks would remain in establishing the existence of damages.

**E. Risks of Maintaining Class Certification**

The risk of obtaining and maintaining class certification through trial also supports approval of the Settlement. Plaintiffs had not yet moved for class certification at the time of the settlement. Defendants would oppose class certification if this case proceeded.

"The value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 816 (3d Cir. 1995). "The prospects of obtaining and maintaining class certification, therefore, have a great impact on the range of recovery one can expect to reap from the action. *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 90–91 (D.N.J. 2001) (citations omitted). However, in *Prudential*, "the Circuit stated that '[b]ecause the district court always possesses the authority to decertify or

modify a class that proves unmanageable, examination of this factor in the standard class action would appear to be perfunctory.'" *Id.* (quoting

*Prudential*, 148 F.3d at 321). "The Circuit explained that '[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement.'" *Id.*

Here, the Class had yet to be certified and there is no guarantee of success, thus the risks favor settlement. *See Harnish v. Widener Univ. Sch. of Law*, No. 153888, 2016 WL 4363133, at *10 (3d Cir. Aug. 16, 2016) (Class certification denied based on predominance).

Moreover, even if the Class was certified for other than settlement purposes, "[t]here will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." In re Prudential Ins. Co., 148 F.3d at 321; see also In re Rent-Way Securities Litigation, 305 F. Supp. 2d 491, 506-07 (W.D. Pa. 2003) ("[A]s in any class action, there remains some risk of decertification in the event the Propose[d] Settlement is not approved. While this may not be a particularly weighty factor, on balance it somewhat favors approval of the proposed Settlement.").

**F. Defendants' Ability to Pay**

This *Girsh* factor "addresses whether Defendants could withstand a [monetary] judgment for an amount significantly greater than the [proposed] Settlement." In re Johnson & Johnson, 900 F. Supp. 2d at 484 (internal quotations omitted); Cendant, 264 F.3d at 240 (same).

Here, OPT is a small company with approximately 30 full-time employees. The Company has one product—the PowerBuoy—which was designed to generate and collect electricity from the motion of waves in the ocean. OPT has a market capitalization of under $20,000,000 and therefore limited financial resources. The Settlement is being paid from available Director and

Officer Liability Insurance Policies ("D&O Policies") as well as OPT cash and stock. Those policies, however, are wasting policies that pay for the cost of defense as well as for any future finding of liability or a settlement. Here, had the Action continued, the amount of available insurance to pay a recovery would have continued to diminish. Absent available insurance coverage, the ability to collect on any judgment equal to or greater than the Settlement Amount was, under current circumstances, questionable and a significant risk to continued litigation. Porritt Decl. ¶ 58. Moreover, the individual defendant in this case, Charles Dunleavy, would not likely be able to satisfy more than a small portion of any money judgment entered against him. Porritt Decl. ¶ 59. Continued litigation thus also presented risk in the ability to collect any amount from the individual defendant.

**G. Range of Reasonableness of Settlement Fund**

"The last two [Girsh] factors evaluate whether the settlement represents a fair and good value for a weak case or a poor value for a strong case." In re Johnson & Johnson, 900 F. Supp. 2d at 484 (internal quotations omitted). "In conducting this evaluation, it is recognized that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution and [courts should] guard against demanding to[o] large a settlement based on the court's view of the merits of the litigation." Id. at 484-85 (internal quotations omitted). These factors inquire "'whether the settlement is reasonable in light of the best possible recovery and the risks the parties would race if the case went to trial.'" Pro v. Hertz Equip. Rental Corp., No. CIV.A. 06-3830 DMC, 2013 WL 3167736, at *5 (D.N.J. June 20, 2013) (quoting Prudential, 148 F.3d at 322).

Lead Plaintiff estimates damages of $18,913,149 under Section 10(b) of the Exchange Act based on 19,468,019 shares, and of $6,999,389 under Section 12(a)(2) of the Securities Act based on 3,800,000 shares. Porritt Decl. at ¶66.

The Section 10(b) damages are based on the decline in Ocean Power's stock price following partially-curative disclosures. The number of damaged shares is based on an estimated public float of approximately 12 million shares, subject to a multi-trader model designed to exclude non-damaged shares, *i.e.*, shares bought and sold prior to any corrective disclosure. Damages are limited to the difference between purchase prices and the mean trading price during the 90-day period following corrective information. The Section 12(a)(2) damages are equal to the difference between the offering price of $3.10 during the April 2014 Secondary Offering and either (i) the sale price per share or (ii) the price per share on July 31, 2015 (current trading price).

The Settlement Fund consists of $3,000,000 in cash and 380,000 shares, plus accrued interest. Thus, the $3,000,000 in cash alone represents an 11.5% recovery for the Class, which is within the range of approval. For example, in securities class actions with estimated damages less than $50 million, the median settlement in 2015 was 6.7% of the estimated maximum recovery. Cornerstone Research, *Securities Class Action Settlements: 2015 Review and Analysis* at 9 (2016). *See AT&T Corp.*, 455 F.3d at 169 (affirming settlement for 4% of total damages); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 319, 339 (W.D. Pa. 1997), *aff'd*, 166 F.3d 581 (3d Cir. 1999) (approving settlement for 5.35% of estimated damages, overruling objections, and collecting cases approving "class settlements involving far smaller percentage recoveries"). The additional value of the shares, as of November 4, 2016, contributes another over 3% to the recovery.

44

Courts in this Circuit have routinely approved settlements providing similar percentages of recovery – or even far less.  See, e.g., In re Viropharma Inc. Sec. Litig., 2016 WL 312108, at *14 (E.D. Pa. Jan. 25, 2016) (approving settlement of 9% to 10% of maximum estimated loss, and noting that, between 1996 and 2014, median settlement amount was 4.8% of projected investor losses ranging between $50 million and $99 million); In re Rite Aid Corp. Sec. Litig., 146 F. Supp. 2d 706, 714-15 (E.D. Pa. 2001) (noting that securities class actions that settled between 1995 and 1999 recovered between 5.5% and 6.2% of estimated losses); see also, e.g., In re Amer. Bus. Fin. Servs. Inc. Noteholders Litig., 2008 WL 4974782, at *3, *9, *13 (E.D. Pa. Nov. 21, 2008) (approving settlement for 2.5% of damages); In re Ikon Office Solutions, Inc., Sec. Litig., 194 F.R.D. 166, 183-84 (E.D. Pa. 2000) (approving settlement for 5.2% to 8.7% of claimed damages).

"The Court [also] notes that both common stock and warrants have been approved as appropriate forms of consideration for attorneys' fees in class action settlements." Seidman v. Am. Mobile Sys., 965 F. Supp. 612, 623 n.10 (E.D. Pa. 1997). See e.g., In re U.S. Bioscience Securities Litigation, 155 F.R.D. 116 (E.D.Pa.1994); In re Ames Department Stores, Inc., Debenture Litigation, 835 F.Supp. 147 (S.D.N.Y.1993). See also In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 134 (D.N.J. 2002) ("The Court notes that, under the current fee request, the attorneys could reap a huge windfall were SoftBrands stock to appreciate in value. However, this possibility does not diminish the reasonableness of the fee application, due to the fact that counsel shouldered, and continues to shoulder, significant risk in litigating this case.").

This Court, nevertheless does have some concerns with the award of stock in this case and, in the absence of guidance from the Third Circuit, looks to the analysis of other district

courts in this Circuit. In Seidman, the Eastern District of Pennsylvania observed the inherent difficulty in awarding shares in the Defendant company as part of lead plaintiff's attorney's fees.

> The Court recognizes that the use of stock and warrants in payment of attorneys' fees injects a measure of uncertainty into the reasonableness of the fee because counsel's ultimate recovery is a function of the marketplace. Nevertheless, the Court finds that in this case two factors counsel in favor of approval of the use of stock and warrants as part of the attorneys' fees. First, based upon expert analysis, the parties have agreed upon the respective values of the stock and warrants, and have satisfied the Court that the settlements are fair, adequate, and reasonable. Second, since counsel themselves are willing to share the same risk as class members as to the ultimate recovery for the value of the stock and warrants, the Court finds that counsel's request is appropriate.

965 F. Supp. at 623 n. 10. The district court was, however, persuaded by the supporting documentation evidencing the value of the shares and the alignment of interest between lead counsel and the class in accepting uncertainty in the value of the shares. Although this Court has not been presented with any expert analysis valuing the shares, relying instead upon the representation of Lead Counsel, the Court observes that as Lead Counsel will share equally in the risk of fluctuation in value of Defendant's shares with members of the class, not conflict of interest is presented and the award of shares as part of attorney compensation is reasonable.

The Settlement Amount is therefore well within the range of reasonableness. Having found that the Girsh factors weigh in favor of approval, the Court turns next to the Prudential factors.

## H. Maturity of Underlying Issues and Existence of Other Litigation

The Third Circuit suggested in Prudential that courts may consider such additional factors as "the maturity of the underlying substantive issues" and the existence and probable outcomes of other individual and/or class actions involving the same underlying facts.  In re Prudential Ins. Co., 148 F.3d at 323.  Those considerations are inapposite here.

Unlike some other types of class actions (such as certain consumer and product-liability class actions), this securities class action does not present particularly novel legal or factual issues that need to mature before the Court can assess the fairness and adequacy of the proposed settlement.

**I. Availability of Opt-Out Rights**

The <u>Prudential</u> court held that courts may also consider the availability of opt-out rights. 148 F.3d at 323.  Such rights exist here.  Dissatisfied potential Class Members were free to exclude themselves from the proposed settlement if they provided notice by October 31, 2016. The lone objector in this case, Mr. Daniell, did not elect to exercise his opt-out rights.

**J. Reasonableness of Attorneys' Fees**

The *Prudential* decision also authorizes consideration of the reasonableness of the plaintiffs' request for attorneys' fees.  *Id.*  The fee request in this case does not present any issues.

First, the parties reached an agreement on the Settlement Amount without any discussion of fees, which will be paid out of the settlement fund in an amount approved by the Court.  The Settlement Agreement itself says nothing about the amount of fees that plaintiffs may seek; nor does it provide that defendants will not object to a fee request below any particular amount.  This case thus does not raise the specter of a "clear sailing" agreement, because the settlement does not provide either for "the payment of attorneys' fees separate and apart from class funds," <u>Laguna v. Coverall N. Am., Inc.</u>, 753 F.3d 918, 925 (internal quotations omitted), *vacated as* <u>moot after settlement</u>, 772 F.3d 608 (9th Cir. 2014), or for defendants' agreement not to contest class counsel's fee request up to a particular amount, <u>see, e.g., Weinberger v. Great N. Nekoosa</u> <u>Corp.</u>, 925 F.2d 518, 524 (1st Cir. 1990) (describing "clear sailing agreement" as one in which

defendant "would not contest the [fee] petition and would pay any sum up to [a specified amount] awarded by the district court").

Second, plaintiffs' fee request is independent of the proposed settlement. The Stipulation provides that the settlement – if approved – can take effect regardless of how the Court rules on plaintiffs' fee request and that plaintiffs cannot terminate the settlement based on the amount of fees awarded.

Third, the Court will award, as will be explained later, a reasonable fee considering the work performed and the interests of the class members.

## K. Reasonableness of the Plan of Allocation

Assessment of a plan of allocation of settlement proceeds in a class action under Fed. R. Civ. P 23 is governed by the same standards of review applicable to the settlement as a whole – the plan must be fair, reasonable, and adequate. *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 326 (3d Cir. 2011) (citation omitted); *Ikon*, 194 F.R.D. at 184; *Walsh*, 726 F.2d at 964 ("The court's principal obligation is simply to ensure that the fund distribution is fair and reasonable."). Courts "generally consider plans of allocation that reimburse class members based on the type and extent of their injuries to be reasonable." *Id*. at 328. In particular, pro rata distributions are consistently upheld, and there is no requirement that a plan of allocation "differentiat[e] within a class based on the strength or weakness of the theories of recovery." *Id*. These decisions acknowledge that the goal of a distribution plan is fairness to the class as a whole, taking into account the various disclosures during the Class Period and establishing a claim value based on the market's reaction to each new piece of information.

In order to develop a fair distribution plan, Plaintiff's Counsel developed the Plan of

Allocation based on the damages analysis and distribution of estimated damages rendered by Plaintiff's damages expert earlier in the litigation. This analysis was, at the time the Settlement was reached, the best estimate of damages that Plaintiff had and is still the analysis that Plaintiff would likely have presented to the trier of fact.

The Plan of Allocation, of course, like Plaintiffs' estimate of Class-wide damages itself, assumes complete success on all aspects of liability and damages at trial and post-trial appeals. Thus, the Plan of Allocation credits all Class members with the best possible result they could have achieved based on the number of shares they purchased and the timing of their purchases and sales of securities.

The Plan of Allocation, in full and complete detail, was included in the Notice Packet mailed to Class members and only one putative class member has objected to it. The Plan of Allocation will equitably apportion the net Settlement proceeds among all eligible Class members using the principles set forth in the case law cited above, and should be approved. *Moore v. GMAC Mortgage*, No. 07-4296, 2014 U.S. Dist. LEXIS 181431, at *14-*15 (E.D. Pa. Sept. 19, 2014) ("'As with other aspects of settlement, the opinion of experienced and informed counsel is entitled to considerable weight.'").

## L. Reasonableness of Claim-Processing Procedures

The claim-processing procedures are the standard ones used in securities class-action settlements.  Class Members may submit Claim Forms to the Claims Administrator, which will make initial determinations about eligibility for settlement relief.  Any Class Member whose claim has been rejected in whole or in part may contest the rejection by submitting an explanation of his or her position to Lead Counsel.  If the dispute cannot be resolved, Lead Counsel will submit it to the Court for final decision.

Having considered all of the Girsh and Prudential factors, this Court approves the settlement as fair and reasonable.

## VIII. ATTORNEY'S FEES

Lead Counsel seeks an award of attorneys' fees of 33% of the $3 million cash Settlement Amount, or $990,000, and 33% of the 380,000 settlement shares, or 125,400 shares of OPT common stock, plus accrued interest. The Court is persuaded by Lead Counsel's submissions that a significant fee is warranted in this case, but finds that an award of 30% of the recovery, or $900,000 and 114,000 shares of OPT common stock, plus accrued interest, better protects the interests of the class members, while still adequately compensating class counsel. The Court also finds that Lead Counsel's request for $22,793.51 in fees is reasonable and will be granted. Attorneys' fees are typically assessed through the percentage-of-recovery method or through the lodestar method.  In re AT&T Corp. Secs. Litig., 455 F.3d 160, 164 (3d Cir. 2006).  The percentage-of-recovery method applies a certain percentage to the settlement fund. See Welch & Forbes, Inc. v. Cendant Corp., 243 F.3d 722, 732 n.10 (3d Cir. 2001).  The lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services.  In re AT&T, 455 F.3d at 164.

In common fund cases such as this one, the percentage-of-recovery method is generally favored because "it allows courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" In re Rite Aid Corp. Sec. Litig., 396 F.3d. 294, 300 (3d Cir. 2005) (quoting omitted); In re Lucent Technologies, 327 F.Supp.2d at 431.  However, the Third Circuit has recommended that district courts use the lodestar method to cross-check the reasonableness of a percentage-of-recovery fee award. See Rite Aid, 396 F.3d at 305.  The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting

in a lodestar multiplier.  "[W]hen the multiplier is too great, the court should reconsider its

calculation under the percentage-of-recovery method, with an eye toward reducing the award."

Rite Aid, 396 F.3d at 306.  The lodestar cross-check, while useful, should not displace a district

court's primary reliance on the percentage-of-recovery method.  In re AT&T, 455 F.3d at 164.

**A. Lodestar Cross-Check**

     Before the Court applies the percentage-of-recovery method therefore, it will briefly

delineate the total lodestar amounts for attorneys, paralegals and law clerk time calculated at

current market rates and by using those numbers, perform a lodestar cross-check to confirm the

reasonableness of the fee request. Having reviewed the attorneys' declarations, the Court is

satisfied that the hourly rate charged for each of the attorneys and his/her staff is based upon a

reasonable hourly billing rate for such services in the given geographical area, the nature of the

services provided and the experience of the lawyer.  Gunter v. Ridgewood Energy Corp., 223

F.3d 190, 195 (3d Cir. 2000).  Having determined that the hourly rates are reasonable and the

amount of hours spent prosecuting this case is also reasonable, the Lead Counsel's lodestar i.e.,

the value of its work had it been paid on an hourly basis, is $456,828.75, for 884.75 hours at a

blended hourly rate of approximately $516 per hour (Lead Counsel has provided a declaration

setting forth the actual hourly rates for the individual billing attorneys and their number of hours

worked; the Court has calculated the blended rate to assess the rates' reasonableness). *See* Porritt

Decl. at ¶¶85-86.

     These hours worked include, among other things, the time spent in the initial

investigation of the case; researching legal issues; reviewing and analyzing OPT's Class Period

and pre-Class Period public filings, annual reports, press releases, quarterly earnings call and

investment conference transcripts, and other public statements; collecting and reviewing a

comprehensive compilation of reports, news articles, filings with the United States Securities and Exchange Commission, and various other public records; reviewing and analyzing stock trading data relating to OPT;  researching and drafting the motion for appointment as Lead Plaintiff; drafting and submitting FOIA requests; identifying and conducting interviews of former Company employees regarding the Company's business practices; drafting amended complaints in this matter; briefing and arguing the motions to dismiss; consulting with an economic expert in the areas of loss causation, market efficiency, and damages; preparing for and participating in a formal full-day mediation process with a nationally regarded third-party neutral, Mr. Bruce Friedman, Esq.; engaging in several arm's length negotiations with the Defendants; obtaining a very favorable settlement offer following arm's length negotiations with defense counsel, and participating in continued negotiation efforts over the weeks following to achieve and finalize the Settlement; and preparing the Settlement, motion papers and related documents necessary to provide notice of the Settlement to Class Members, and to obtain preliminary and final approval of the Settlement.

Lead Plaintiff requests 33% of the cash award and shares of common stock. As of November 4, 2016, Lead Plaintiff represents that the 380,000 shares of OPT stock have a market value of approximately $836,000. Accordingly, using the market value of the requested 125,400 shares of OPT common stock, the total value of Lead Counsel's requested 33% fee award would be $1,265,880 ($990,000 in cash + $275,880 in stock). The multiplier generated here by the ratio of the requested fee to Lead Counsel's lodestar is 2.77.

In this circuit, multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.  In re AT&T, 455 F.3d at 172; see e.g., Weiss, 899 F.Supp. at 1304; Muchnik v. First Fed. Savings & Loan Ass'n, 1986 WL 10791 (E.D. Pa. 1986).

Lead Counsel's proposed 2.77 multiplier is the middle-to-upper part of the range, which gives this Court some pause due to the relatively early stage at which the litigation was settled. In In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 742 (3d Cir. 2001), the Third Circuit observed that "[i]n all the cases in which high percentages were applied to arrive at attorneys' fees, the courts explained the extensive amount of work that the attorneys had put into the case, and appropriately the lodestar multiplier in those cases never exceeded 2.99." When, as in Cendant, litigation was settled at an early stage, the Third Circuit, in reversing the district court below, "strongly suggest[ed] that a lodestar multiplier of 3 . . . is the appropriate ceiling for a fee award, although a lower multiplier may be applied in the District Court's discretion." In re Cendant, 243 F.3d at 742. See also Rite Aid, 396 F.3d at 303 (explaining that the lodestar multiplier of 3 was appropriate in Cendant because the case was "neither legally nor factually complex," was of short duration, involved a limited amount of motion practice, and required only 5,600 hours of work by counsel). Here, while the Court recognizes the good work of Lead Counsel in bringing this matter to a prompt resolution, the matter was settled before the adjudication of the motion to dismiss, was not legally or factually complex, involved limited discovery, and required the expenditure of only approximately 885 hours by Lead Counsel.

As such, the Court finds that while a multiplier in the middle of the accepted range is warranted, a multiplier of 2.77 is simply too high in this case of short duration, uncomplicated legal issues, and relatively limited hours. Looking to the Third Circuit's decisions in the area of securities settlements, the Court is persuaded that a 30% fee of $900,000 and 114,000 shares of OPT common stock is appropriate (total value $1,150,800 by November 4 stock valuation). I look to, for example, In re Veritas Software Corp. Sec. Litig., 396 F. App'x 815, 818 (3d Cir. 2010), where the Third Circuit affirmed a final approval of settlement, observing that "[w]hile

the 30% fee is admittedly large, the District Court took into account that class counsel spent four

years, and thousands of hours of attorneys' labor, litigating this case. The final lodestar multiplier

of 1.52 was well within the range of attorneys' fees awarded and approved by this Court." 

Recalculating the lodestar in this case on the basis of a 30% award, therefore, gives rise to a

multiplier of 2.51, which this Court finds acceptable.

## B. Percentage of Recovery

When analyzing a fee award in a common fund case under the percentage-of-recovery

method, the Court considers several factors, many of which are similar to the <u>Girsh</u> factors as

enunciated previously. See <u>Rite Aid</u>, 396 F.3d at 301 n.9. These include:

(1) the size of the fund created and the number of persons benefitted;

(2) the presence or absence of substantial objections by members of the class to the

settlement terms and/or fees requested by counsel;

(3) the skill and efficiency of the attorneys involved;

(4) the complexity and duration of the litigation;

(5) the risk of nonpayment;

(6) the amount of time devoted to the case by plaintiffs' counsel; and

(7) the awards in similar cases.

<u>Id.</u> at 301 (citing <u>Gunter v. Ridgewood Energy Corp.</u>, 223 F.3d 190, 195 n.1 (3d Cir.

2000). This list is not exhaustive. In <u>Prudential</u>, the Third Circuit noted three other factors that

may be relevant and important to consider: (1) the value of benefits accruing to class members

attributable to the efforts of class counsel as opposed to the efforts of other groups, such as

government agencies conducting investigations, <u>Prudential</u>, 148 F.3d at 338; (2) the percentage

fee that would have been negotiated had the case been subject to a private contingent fee

agreement at the time counsel was retained, Id. at 340; and (3) any "innovative" terms of

settlement, Id. at 339.  The fee award reasonableness factors "need not be applied in a formulaic

way" because each case is different, "and in certain cases, one factor may outweigh the rest."

Rite Aid, 396 F.3d at 301 (quoting Gunter, 223 F.3d at 195 n.1).  The Court may give some of

these factors less weight in evaluating a fee award. See In re Cendant, 264 F.3d at 283;

Prudential, 148 F.3d at 339.  Moreover, the analysis of the Gunter factors overlaps with the Grish

factors used to assess the appropriateness of the settlement.  In that regard, the Court will refer to

its earlier findings when reviewing this fee application.

**1. The Fund Is Substantial and Confers a Benefit Upon The Class Members**

The first *Gunter* factor "consider[s] the fee request in comparison to the size of the fund

created and the number of class members to be benefitted." Rowe v. E.I. DuPont de Nemours &

Co., 2011 WL 3837106, at *18 (D.N.J. Aug. 26, 2011). That is because the sheer magnitude of

damages has a heavy impact on the amounts defendants are willing to pay to settle their liability.

Bredbenner v. Liberty Travel, Inc., No. CIV.A. 09-1248 MF, 2011 WL 1344745, at *19 (D.N.J.

Apr. 8, 2011) (awarding fee of one third of settlement fund because case involved relatively

small fund and relatively few class members). Thus, granting counsel a similar percentage of a

smaller fund may simply punish counsel for having litigated a smaller case. Moreover, because

of fixed costs and economies of scale, attorneys' fees and costs do not increase dollar-for-dollar

with the size of the case. Thus, it takes a greater percentage of the settlement to support litigation

in a smaller case.

Here, Plaintiff's Counsel has succeeded in obtaining a settlement of $3 million cash and

380,000 shares of OPT common stock.  While the number of persons benefited is undeniably

large — to date, over 19,525 Notice Packets have been sent to potential Class Members, Peters

Decl. at ¶8 — the cash benefit alone to the Class represents almost 12% of the total estimated damages that could be recovered if Plaintiff were completely successful on each and every issue of liability and damages in the Action, and 100% of eligible Class members file and prove their claims. As a result of the Settlement, Class members will receive immediate compensation for their losses in OPT securities and will avoid the substantial risks of no recovery had the Action been litigated and lost at summary judgment, trial or on appeal or that any judgment would have been uncollectable.

**2. Absence of Objection to the Fee Request**

Here, the Claims Administrator disseminated 19,525 Notice Packets to potential class members; published the Summary Notice in the national edition of *PR Newswire*; and has been administrating a website and Toll Free Phone Service to field OPT shareholder questions.  Peters Decl. at ¶¶6-11.  The Notice informed Class members that Plaintiff's Counsel would apply for attorneys' fees not to exceed 33% of Settlement Fund and reimbursement of litigation expenses not to exceed $25,000. The Notice advised Class members of their right to object to the Settlement, the Plan of Allocation or to Plaintiff's Counsel's fee request. Objector Daniell filed an objection on October 31, 2016 to the Settlement and Plan of Allocation, but did not challenge the fee request. No other challenges to the fee request have been received. The lack of any negative feedback after such extensive notice suggests that the Class generally and overwhelmingly approves of the settlement. *See Varacallo v. Mass. Mutual Life Ins. Co.*, 226 F.R.D. 207, 237-38 (D.N.J. 2005) (finding exclusion and objection requests of .06% and .003%, respectively, "extremely low" and indicative of class approval of the settlement).

**3. Lead Counsel Prosecuted This Action With Skill And Efficiency**

The skill and efficiency factor under *Gunter* also weighs heavily in favor of a 30% award. Lead Counsel's skill and efficiency is "measured by the quality of the result achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of the counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel." Hall v. AT&T Mobility LLC, No. CIV.A. 075325 JLL, 2010 WL 4053547, at *19 (D.N.J. Oct. 13, 2010).

The Porritt Declaration describes the background and experience of Plaintiff's Counsel representing Lead Plaintiff and the Class.  *See* Porritt Decl., Ex. A.  Plaintiff's Counsel is highly specialized in the field of securities class action litigation. Plaintiff's Counsel's efforts in efficiently obtaining a very substantial recovery for the Class is the best indicator of their abilities.  Plaintiff's Counsel brought their significant experience to bear in achieving this Settlement.  Plaintiffs' Counsel's efforts in bringing this action to such a successful conclusion are the best indicator of the experience and ability of the attorneys involved. *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 132 (D.N.J. 2002) ("'the single clearest factor reflecting the quality of class counsels' services to the class are the results obtained'") (*quoting Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 149 (E.D. Pa. 2000)).

Plaintiff's Counsel pursued the prosecution of this Action to obtain the maximum recovery for the Class, including conducting an investigation into the allegations against Defendants, reviewing public documents available about the Company, interviewing several witnesses, and consulting with experts concerning the issues in the case.   As a result, Plaintiff's Counsel marshaled the factual and legal information needed to successfully negotiate the exceptional settlement before the Court. The fact that Plaintiff's Counsel accomplished this

without lengthy court proceedings should be commended especially in light of the financial circumstances of OPT and the limited availability of any source for recovery for the Class. The foregoing speaks volumes for the quality of representation the Class has received.

Moreover, the quality and vigor of opposing counsel is also important in evaluating the services rendered by Plaintiff's Counsel.  See, e.g., Ikon, 194 F.R.D. at 194; In re Warner Commc'ns Sec. Litig., 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("The quality of opposing counsel is also important in evaluating the quality of plaintiffs' counsels' work."), aff'd, 798 F.2d 35 (2d Cir. 1986).  Here, Defendants were represented by Dechert LLP, Sills, Cummins & Gross P.C., Cooley LLP, Bressler, Amery & Ross, P.C., and Stroock & Stroock & Lavan LLP, prominent law firms with substantial experience in securities class actions. Porritt Decl. at ¶ 76. Thus, the fact that Plaintiff's Counsel achieved this Settlement for the Class in the face of such formidable legal opposition further evidences the quality of their work.

**4. The Complexity, Expense, and Likely Duration of Litigation Weigh in Favor of the Court's Award**

The fourth Gunter factor is intended to capture "the probable costs, in both time and money, of continued litigation" and favors the requested fee. See In re General Motors, 55 F.3d at 812 (quoting Bryan v. Pittsburgh Plate Glass Co., 494 F.2d 799, 801 (3d Cir. 1974)).

Here, even if Plaintiffs' Complaint survived Defendants' motion to dismiss, their case would have faced additional legal and factual hurdles on summary judgment, at trial, and potentially on appeal. In re HiCrush Partners L.P. Sec. Litig., No. 12-CIV-8557 CM, 2014 WL 7323417, at *16 (S.D.N.Y. Dec. 19, 2014) ("Over the last five years, nearly 48% of all securities class actions have been dismissed on motions prior to trial, while plaintiffs who succeeded at trial have found their judgments overturned on post-trial motions or appeal").

Considering the magnitude and expense of this securities case, a 30% fee award is reasonable.

**5. Lead Counsel Undertook the Risk of Non-Payment**

Lead Counsel undertook this action on an entirely contingent fee basis, taking the risk that the litigation would yield no or very little recovery and leave it uncompensated for its time, as well as for its out-of-pocket expenses. Courts across the country have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. In re Schering-Plough Corp. Enhance Sec. Litig., No. CIV.A. 08-2177 DMC, 2013 WL 5505744, at *28 (D.N.J. Oct. 1, 2013). The risk of non-payment is especially high in securities class actions, as they are "notably difficult and notoriously uncertain." See Trief v. Dun & Bradstreet Corp., 840 F. Supp. 277, 281 (S.D.N.Y. 1993). Legal precedents are continually making it more difficult to plead securities class actions. In re BP p.l.c. Sec. Litig., 852 F. Supp. 2d 767, 820 (S.D. Tex. 2012) ("The Court is acutely aware that federal legislation and authoritative precedents have created for plaintiffs in all securities actions formidable challenges to successful pleading.").

Here, Lead Counsel undertook this litigation on a contingency basis and with no guarantee its time or expenses would be reimbursed. In light of the difficulty of undertaking such a case, Lead Counsel should be reimbursed for its time and expenses.

**6. Lead Counsel Spent Significant Time Investigating and Litigating the Case**

The sixth Gunter factor looks at counsel's time devoted to the litigation. Gunter, 223 F.3d at 199. This factor is usually considered with the lodestar cross-check to look at reasonableness of counsel's requested fee. I have reviewed the affidavits in this case and find the over 884 hours

expended by Lead Counsel to be significant, although not necessarily as extensive as those observed in some other securities actions that progress to a later stage of litigation.

**7. The Court's Award Is Consistent With Awards in Similar Cases**

The 30% fee the Court awards here is appropriate and comfortably within the range of fees typically awarded. While there is no benchmark for the percentage of fees to be awarded in common fund cases, the Third Circuit has observed that fee awards generally range from 19% to 45% of the settlement fund. General Motors, 55 F.3d at 822. For smaller securities fraud class actions, "courts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses." In re Ravisent Techs., Inc. Sec. Litig., No. CIV.A.00-CV-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005) (collecting cases). The 30% fee awarded is appropriate given the early stage at which this litigation was resolved. Schuler v. Medicines Co., No. CV 14-1149 (CCC), 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (awarding one third of settlement as fees in case that settled before decision on motion to dismiss); In re Merck & Co., Inc. Vytorin Erisa Litig., No. CIV.A. 08CV-285DMC, 2010 WL 547613, at *11 (D.N.J. Feb. 9, 2010) "review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71% with a median value that turns out to be one-third") (quoting In re Remeron Direct Purchaser Antitrust Litig., No. CIV.03-0085 FSH, 2005 WL 3008808, at *15 (D.N.J. Nov. 9, 2005)); In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 101 (D.N.J. 2001) (awarding one third and citing representative fee awards, which ranged from 27.5% to 33.8% with a median of 33⅓%).

**8. The Awarded Fee Percentage Is Consistent With Contingent Fee Arrangements in Privately Negotiated Non-Class Litigation**

A 30% fee is also consistent with typical fee awards in non-class cases. See In re RJR

Nabisco, Inc. Sec. Litig., No. 818 (MBM), 1992 WL 210138, at *7 (S.D.N.Y. Aug. 24, 1992)

("What should govern [contingent fee] awards is not the essentially whimsical view of a judge,

or even a panel of judges, as to how much is enough in a particular case, but what the market

pays in similar cases."). If this were an individual action, the customary contingent fee would

likely range between 30 and 40 percent of the recovery. See, e.g., Ikon, 194 F.R.D. at 194 ("[I]n

private contingency fee cases, particularly in tort matters, plaintiffs' counsel routinely negotiate

agreements providing for between thirty and forty percent of any recovery."); *Blum*, 465 U.S. at

903 n. *19 (Brennan, J., concurring) ("In tort suits, an attorney might receive one-third of

whatever amount the plaintiff recovers. In those cases, therefore, the fee is directly proportional

to the recovery."). Lead Counsel's fee of 30% of the Settlement fund comports with these private

standards.

Thus, this factor supports the Court's award of 30% of the Settlement Fund to Lead

Counsel.

## B. Lead Counsel's Expenses Were Reasonable and Necessary to Litigate the Action

"Counsel in common fund cases is entitled to reimbursement of expenses that were

adequately documented and reasonably and appropriately incurred in the prosecution of the

case." In re Cendant Corp., Deriv. Action Litig., 232 F. Supp. 2d 327, 343 (D.N.J. 2002). In this

case, the Notice provided to the members of the Class informed them that Plaintiff's Counsel

would seek reimbursement of their expenses incurred in the prosecution of the Action up to

$25,000. Lead Counsel requests that this Court reimburse the $22,793.51 of litigation expenses

that counsel advanced in connection with this Action. The requested expenses are summarized by

category in the Porritt Declaration.  *See* Porritt Decl. at ¶88.  These expenses include, *inter alia*,

the costs of Plaintiff's private investigator, photocopying, postage, messengers, filing fees, travel,

long distance telephone, telecopier, mediation fees, and the fees and expenses of Plaintiff's

damages expert.  While Plaintiff's Counsel incurred fees for computer research, these fees are

not included in the request for reimbursement.  Plaintiff's Counsel submit that these expenses

were reasonably and necessarily incurred to achieve the result obtained for the Class.  All of the

various categories of expenses for which Plaintiff's Counsel seek reimbursement herein are the

type of expenses routinely charged to hourly paying clients and, therefore, should be reimbursed

out of the common fund. *See* In re Cendant Corp., Derivative Action Litig., 232 F. Supp. 2d at

344 (consultants and computer-assisted research); Beckman v. KeyBank, N.A., 293

F.R.D. 467, 482 (S.D.N.Y. 2013) (mediator's fees); *In re Metlife Demutualization Litig.*, 689 F.

Supp. 2d 297, 364 (E.D.N.Y. 2010) (reimbursing "expert fees, electronic research charges, long

distance telephone and facsimile charges, postage and delivery expenses, discovery costs, filing

fees, photocopying, expenses associated with locating and interviewing dozens of witnesses, and

out-of-town travel expenses").

  This Court finds that these expenses were reasonably necessary for the prosecution of this

litigation.

## IX. CONCLUSION

  Lead Plaintiff's motion for final approval of the parties' settlement in the amount of $3

million in cash and 380,000 shares of OPT common stock, plus accrued interest is granted. Lead

Plaintiff's motion for the award of attorney's fees is granted, Lead Counsel is awarded $900,000

and 114,000 shares of OPT common stock, plus $207.55 in interest, and $22,793.51 in costs.

Dated:   11/15/2016       /s/ Freda L. Wolfson
                 The Honorable Freda L. Wolfson
                 United States District Judge